# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| M.D.R., by her parent and natural guardian, LIANNI ROSY RIVERA | CIVIL ACTION |
| v. | NO: 2:22-cv-00621-MAK |
| TEMPLE UNIVERSITY HOSPITAL | |
| v. | |
| UNITED STATES OF AMERICA | |

## DEFENDANT TEMPLE UNIVERSITY HOSPITAL'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff instituted this action through the filing of a Complaint in the Philadelphia Court of Common Pleas on September 15, 2021, naming Temple University Hospital ("TUH") and Clinton Turner, M.D. as Defendants. *See* Complaint, Exhibit "A" (APP 0001-0012).

2. The action arises out of care provided to Plaintiff Lianni Rosy Rivera and the birth of Minor Plaintiff M.D.R. on December 22, 2010[1] at TUH. *Id.*

3. Plaintiff alleges in the Complaint that M.D.R. suffered a brachial plexus injury as the result of negligent care by Defendants. *Id.*

4. Following removal of the case to federal court, the Court granted the USA's motion to substitute itself as a defendant for Dr. Turner, dismissed Plaintiff's claims against the USA for failure to exhaust administrative remedies and granted TUH leave to file a Third-Party claim against the United States.

5. TUH subsequently filed a Third-Party Complaint against the USA.

---

[1] The Complaint mistakenly asserts that the delivery occurred on November 22, 2010

6. On December 21, 2010, Ms. Rivera presented to TUH after her water broke at home. *See* deposition transcript of Ms. Rivera, Exhibit "B," 38:21-39:2 (APP 0051-0052).

7. Ms. Rivera labored overnight and Dr. Turner assumed responsibility as the attending physician for Ms. Rivera on the morning of December 22, 2010. *See* June 14, 2022 deposition transcript of Clinton Turner, M.D., Exhibit "C," 49:22 – 51:8 (APP 0199-0201).

8. Dr. Turner examined Ms. Rivera and documented a progress note at 10:30 a.m., indicating that Ms. Rivera was 8-9 cm dilated with an estimated fetal weight of 8 – 8.5 pounds. *Id.* at 51:4 – 52:5(APP 0201-0202).

9. Ms. Rivera began pushing at 11:52 a.m. with spontaneous delivery of the baby's head at 12:38 p.m., at which time a shoulder dystocia was diagnosed. *Id.* at 61:14 – 61:24 (APP 0211).

10. A shoulder dystocia occurs at the time of delivery when the baby's head passes through the vaginal canal and the vaginal outlet, but a shoulder becomes impacted under the pubic bone. *Id.* at 22:11-22 (APP 0172).

11. Interventions performed in this case to facilitate delivery were identified by Dr. Turner as follows: placement of the patient in exaggerated McRoberts position, left mediolateral episiotomy and suprapubic pressure, followed by Woods screw maneuver and delivery of the left posterior shoulder, which Dr. Turner documented led to resolution of the shoulder dystocia and delivery of the baby at 12:40 p.m. *Id.* at 61:24 – 62:5 (APP 0211-0212).

12. The physicians present for the delivery were Dr. Turner and obstetrical residents Amanda Horton, M.D. and Nadia Gomez, M.D. *Id.* at 63:1-2 (APP 0213).

13. In December 2010, Dr. Horton was a first-year OB/GYN resident at TUH. *Id.* at 44:4-10 (APP 0194).

14. In December 2010, Dr. Gomez was a third-year OB/GYN resident at TUH. *Id.* at 68:23 – 69:6 (APP 0218-0219).

15. Dr. Turner testified that shoulder dystocia was diagnosed when the fetal head was delivered and gentle traction failed to result in the spontaneous delivery of the balance of the baby's body. *Id.* at 63:3-9; 64:15-22 (APP 0213; 0214).

16. Dr. Turner testified that residents are trained to apply as little traction as necessary on the baby during delivery. *Id.* at 66:8 – 67:14 (APP 0216-0217).

17. Dr. Turner testified that if Dr. Gomez or Dr. Horton were hands on during the delivery of the fetal head and thereafter applied traction in an attempt to complete the delivery, it was his responsibility as the supervising physician to direct them to stop if he believed that traction that was being employed was excessive. *Id.* at 69:11-18 (APP 0219).

18. Dr. Turner testified that based on his customary practice, when a shoulder dystocia diagnosis is made, the patient is placed in McRoberts position (knees flexed at the abdomen), suprapubic pressure is applied, which helps to adduct the shoulders, and gentle traction is applied to the baby's head to see if the shoulders will dislodge. *Id.* at 70:9-12 (APP 0220).

19. Dr. Turner testified that he believed that one of the residents, whom he assumed was Dr. Horton, would have been applying gentle traction to the fetal head while Ms. Rivera was in exaggerated McRoberts position and suprapubic pressure was applied. *Id.* at 72:3 – 73:1 (APP 0222-0223).

20. Dr. Turner testified that he did not recall Dr. Horton applying excessive traction and that he would have included information in his delivery note if anything other than normal traction had been used during the delivery. *Id.* at 74:24 – 75:18 (APP 0224-0225).

21. Dr. Horton testified that she was performed to perform spontaneous vaginal deliveries in December 2010, supervised by an attending physician. *See* May 31, 2022 deposition transcript of Amanda Horton, M.D., Exhibit "D," 8:2-20 (APP 0263).

22. Dr. Horton had no recollection of anything that occurred during the hospitalization of Ms. Rivera or the delivery of M.D.R. *Id.* at 8:20-24 (APP 0263).

23. Dr. Gomez testified that she recalled that Dr. Horton was attempting a vaginal delivery by applying gentle traction to the fetal head, at which point the shoulders did not deliver, and Dr. Turner took over the delivery of the baby. *See* June 10, 2022 deposition transcript of Nadia Gomez, M.D., Exhibit "E," 14:16-23 (APP 0302).

24. Ms. Rivera testified that did not remember much of what occurred while she was pushing, other than a doctor pushing on the top of her stomach and her mother and sister holding her legs up. *See* Exhibit "B," 49:2-22 (APP 0062).

25. Ms. Rivera further testified that there were two women in the room prior to and at the time of the delivery whom she thought were medical studies, but she did not remember what they were doing while she was pushing. *Id.* at 51:17 – 52:15 (APP 0064-0065).

26. Ms. Rivera further testified that one of the women said that the baby was stuck, at which Dr. Turner started performing maneuvers to perform delivery. *Id.* at 54:16 – 55:10 (APP 0067-0068).

27. Ms. Rivera testified she saw Dr. Turner pushing down on her stomach, and her sister and mother were asked to lift up her legs as high as they can. *Id.* at 55:22 – 56:21 (APP 0068-0069).

28. Ms. Rivera had no recollection of anything else being done to deliver M.D.R. and did not remember if anyone put their hands inside to help deliver M.D.R. *Id.* at 56:22 – 57:10 (APP 0069-0070).

29. Ms. Rivera's mother Rosa Pimental was present for M.D.R.'s delivery and testified that she observed that two medical students went to get the baby's head out but could not get the shoulder out, at which time the supervisor came over and said he had to break the baby's arm, made a long cut, and pulled her quickly. *See* September 1, 2022 deposition transcript of Rosa Pimental, Exhibit "F," 32:9 – 33:15 (APP 0378-0379).

30. Ms. Pimental further testified that she recalled one of the physicians pushing on her abdomen and the others were "sticking their hands inside." *Id.* at 49:18-25 (APP 0395).

31. Ms. Rivera's sister Rosilianny Martinez-Moran was also present for the delivery and testified that she recalled a male doctor and a female doctor in the room when the delivery process started. *See* September 1, 2022 deposition transcript of Rosilianny Martinez-Moran, Exhibit "G," 26:12-22 (APP 0428).

32. Ms. Martinez-Moran testified that she was holding one of her sister's legs during the delivery and said she was not able to see what the doctors were doing, that one of the doctors took over and that everything happened very fast. *Id.* at 28:23 – 29:13 (APP 0430-0431).

33. Plaintiff produced the August 30. 2022 expert report and curriculum vitae of Jeffrey Soffer, M.D., an Obstetrician-Gynecologist and Fellow of the American College of Obstetricians and Gynecologists. *See* expert report and curriculum vitae of Jeffrey Soffer, M.D., Exhibits "H" and "I" (APP 0455-0460).

34. Dr. Soffer opines in his expert report that "sub-standard care was exhibited by the Obstetricians administering care to Ms. Rivera during her delivery on 12/22/10 resulting in her child's permanent brachial plexus injury. *See* Exhibit "H," at 2 (APP 0457).

35. Dr. Soffer further opines that "[p]ermanent brachial plexus injury occurs as a direct result of excess lateral traction being applied to the fetal head following its delivery," and that the "injury to [Plaintiff's] brachial plexus occurred either following the delivery of the head by Dr. Horton or by Dr. Turner during his initial attempt at delivery or in between the application of the internal maneuvers." *Id.*

36. Additionally, Dr. Soffer opines that the "natural forces of labor cannot cause a permanent brachial plexus injury." *Id.*

37. Dr. Soffer cites four articles in support of his opinions. *Id.*

38. Plaintiff also produced the August 29, 2022 and September 12, 2022 expert reports and curriculum vitae of Daniel Adler, M.D., a pediatric neurologist. *See* expert reports and curriculum vitae of Dr. Adler, Exhibits "J," "K," and "L" (APP 0461-0484).

39. Dr. Adler states that in his opinion, "maternal forces have never been proven to be the cause of a permanent neonatal brachial plexus injury when the fetus does not have exaggerated risk of nerve stretch" and that "the degree of forceful stretch required to produce the traumatic neonatal brachial plexus injury seen in this case did not occur from the forces of labor nor from the mother pushing during labor." Exhibit "J," at 6 (APP 0467).

40. Dr. Adler concludes in his expert report that "the traumatic neonatal brachial plexus [injury] in this [case] occurred after the fetal head was delivered as a result of the movement of the fetal head supplied by the operator." *Id.*

41. Dr. Adler cites four articles/texts in support of his opinions. *Id.* at 7 (APP 0468).

42. Defendant TUH produced the August 23, 2022 expert report, September 14, 2022 rebuttal report and curriculum vitae of Robert Gherman, M.D., a Maternal Fetal Medicine physician who was Chairman of the American College of Obstetrics and Gynecology Task Force on Neonatal Brachial Plexus Palsy. S*ee* expert reports and curriculum vitae of Dr. Gherman, Exhibits "M," "N," and "O" (APP 0485-0515).

43. Dr. Gherman opines that Dr. Horton, Dr. Gomez and Dr. Turner met the standard of care, stating as follows:

> It is my opinion within a reasonable degree of medical probability that standardly described maneuvers were used to alleviate the shoulder dystocia. As it is a neurologic endpoint only, an expert witness cannot conclude anything about the amount of traction that was applied during the delivery/shoulder dystocia by using the basis of a permanent peripheral nerve injury. It is my medical opinion, to a reasonable degree of medical probability, that the cause of this child's brachial plexus palsy was the shoulder dystocia itself. There is a large body of research published in peer-reviewed publications that attribute the endogenous forces that occur during delivery as a primary cause of shoulder dystocia and brachial plexus injury. I see no evidence in the medical record or deposition transcripts that would support a plaintiff's expert claim of "excessive" lateral traction.

Exhibit "M" at 3 (APP 0488).

44. Dr. Gherman cites 21 sources from the medical literature in support of his opinions, including the ACOG Task Force Neonatal Brachial Plexus Palsy manuscript, which he notes states as follows:

> Neither high quality nor consistent data exist to suggest that neonatal brachial plexus palsy can be caused only by a specific amount of applied force beyond that typically used by health care providers during any delivery. Instead, available data suggest that the occurrence of neonatal brachial plexus palsy is a complex event, dependent not only on the forces applied at the moment of delivery, but also on the constellation of forces (e.g. vector and rate of application) that have been acting on the fetus during the labor and delivery process, as well as individual fetal tissue characteristics (e.g. in situ strain and acid-base balance).
>
> In addition to research within the obstetric community, the pediatric, orthopedic, and neurologic literature now stress that the existence of neonatal brachial

palsy following birth **does not** a priori indicate that exogenous forces are the cause of this injury. The ACOG Task Force Neonatal Brachial Plexus Palsy manuscript likewise states, 'No published clinical or experimental data exist to support the contention that the presence of persistent (as compared to transient) neonatal brachial plexus palsy implies the application of excessive force by the birth attendant.'

Id. at 4 (APP 0489) (emphasis original), citing The American College of Obstetricians and Gynecologists Task Force on Neonatal Brachial Plexus Palsy. ACOG, *Neonatal Brachial Plexus Palsy,* 2014, Exhibit "P" at p. xvi (APP 533).

45. Among the other articles cited by Dr. Gherman is a 2020 article published in the "Green Journal" (Obstetrics and Gynecology), in which the authors stated:

Although it might be hypothesized that transient brachial plexus injury may occur as a result of the above-described uterine forces but permanent injury could only occur as a result of excessive, physician applied traction, neither published data nor biologic plausibility support such a concept. Because the severity of any tissue injury is related both to the force applied and a variable resistance of involved tissue to injury, such a binary mode of injury is not only completely unsupported by clinical data but also ignores known biologic variability in the susceptibility of human soft tissue, including neural tissue, to traumatic injury and recovery.

Exhibit "M" at 5 (APP 0490); *See* Johnson G.J., et al, *Pathophysiologic Origins of Brachial Plexus Palsy*, Obstetrics & Gynecology, 136(4): 725-730 (2014), Exhibit "Q" (APP 0649).

46. In his rebuttal expert report, Dr. Gherman states that his opinions have not changed upon reviewing the reports of Dr. Soffer and Dr. Adler, and he further comments on the literature cited by Plaintiff's experts. *See* Exhibit "N" (APP 0495-0502).

47. The USA produced the expert report and curriculum vitae of Christian Pettker, MD, a Maternal Fetal Medicine physician. *See* August 23, 2022 expert report and curriculum vitae of Dr. Pettker, Exhibits "R" and "S" (APP 0652-0691).

48. Dr. Pettker cites various sources in the medical literature, including the ACOG Task Force Report on Neonatal Brachial Plexus Palsy referenced *infra*, in support of his opinion "that

8

the infant could have sustained her brachial plexus injury as a result of the physiology (rather than the management) of the labor and delivery shoulder dystocia" and that "the nature and severity of the infant's injury is an insufficient basis on which to conclude the manner or source of the force causing the injury." Exhibit "R" at 5-8 (APP 0657-0660).

49. TUH and the USA produced the August 25, 2022 expert report, September 14, 2022 rebuttal report and curriculum vitae of Joshua Abzug, M.D., a pediatric orthopedist and Director of the University of Maryland Brachial Plexus Practice. *See* expert reports and curriculum vitae of Dr. Abzug, Exhibits "T," "U" and "V" (APP 0692-0786).

50. Dr. Abzug opines in his expert report that:

> It should be noted that Mia's brachial plexus injury likely occurred when the head was stretched away from the shoulder. Such a stretch may occur in the obstetrical setting, including through maternal forces of labor with and without the complication of shoulder dystocia. During a delivery complicated by shoulder dystocia, the fetal shoulder is trapped behind the maternal pubis while the forces of labor propel the body and head forward. This combination of forces can result in a stretch of the shoulder away from the head. If the stretch is significant in force and duration, the nerves of the brachial plexus become damaged. If the fetus is hypotonic, as with Mia, such that the protective reflexes of the muscles are not sufficiently present, the brachial plexus is more susceptible to injury. The thought that a brachial plexus injury can only occur during the birthing process due to excessive traction is just false.

Exhibit "T" at 6 (APP 0698).

51. In his rebuttal report, Dr. Abzug opines that he disagrees with Dr. Adler and Dr. Soffer's opinions regarding the cause of the brachial plexus injury in this case. Exhibit "U" at 3 (APP 0703).

9

Respectfully submitted,

BY:   */s/ Richard S. Margulies, Esq.*
      JAMES A. YOUNG, ESQ. (PA 00213)
      RICHARD S. MARGULIES, ESQ. (PA 62306)
      BURNS WHITE LLC
      1880 John F. Kennedy Boulevard, 10th Floor
      Philadelphia, PA 19103
      jayoung@burnswhite.com
      rsmargulies@burnswhite.com
      Telephone: 215-587-1600
      Facsimile: 215-587-1699

Dated: September 16, 2022

## CERTIFICATE OF SERVICE

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true copy of the foregoing Statement of Undisputed Material Facts of Defendant Temple University Hospital to be served on the below-listed parties as follows:

**VIA ECF**
Michael J. Weiss, Esquire
1236 Brace Road
Suite B
Cherry Hill, PA 08034
*Counsel for Plaintiff*

**VIA ECF**
Gerald B. Sullivan, Esquire
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106-4476
*Counsel for United States of America*

By: */s/ Richard S. Margulies, Esq.*
RICHARD S. MARGULIES

Dated:  September 16, 2022